# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
March 11, 2026

Lyle W. Cayce
Clerk

No. 24-30754

────────────

Logan Guidry; Kenneth Cotton, III,

*Plaintiffs—Appellants*,

*versus*

Louisiana Department of Public Safety; Jerry Goodwin,

*Defendants—Appellees*.

────────────────────────────

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:16-CV-1463

────────────────────────────

Before Jones, Stewart, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

During the middle of the night, an inmate at a Louisiana prison used a prison-issued padlock and tragically beat another inmate to death. The victim inmate's family sued the prison and its warden for constitutional and state-law violations. The district court granted summary judgment, dismissing the families' federal and state claims. Because summary judgment was proper, this court AFFIRMS.

────────────────────────

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-30754

## I. Background

David Wade Correctional Center ("DWCC"), a Louisiana prison located in Claiborne Parish, houses a total of 1,176 offenders—918 of whom are classified as minimum or "medium" custody and 258 of whom are classified as maximum custody. Like most prisons, theft of property is common at DWCC, and those incidents of theft often lead to violence between the inmates. DWCC thus allows inmates to have padlocks and footlockers to secure their personal belongings.

Although it allows padlocks, DWCC does not have a specific written policy on padlocks. But because it assigns inmates only two lockers to secure their belongings, DWCC effectively limits the number of padlocks to two per inmate: one that DWCC issues to the inmate, and another that the inmate may purchase.

Since 2008, Warden Jerry Goodwin has helped oversee the administration and operation of the prison while supervising its staff. As a supervisor, Warden Goodwin knew that inmates occasionally used padlocks to assault other inmates. From 2012 to January 2023, the prison experienced 16 inmate-on-inmate attacks that involved the use of padlocks, an average of 1.6 padlock incidents per year. With such a low number, Warden Goodwin believed that issuing padlocks represented "a reasonable way" to help inmates secure their belongings and "outweigh[ed] the risk that the padlock will be used as a weapon."

Unfortunately, Kenneth Cotton, Jr., an inmate at DWCC, was the victim of a padlock attack in February 2016. Around midnight, while Cotton was sleeping in his bed, Anthony Tellis—a fellow inmate who shared a dormitory with Cotton—reached under his pillow and pulled out a state-issued laundry bag with a padlock inside. At about 12:06 a.m., he stood up,

2

walked over to Cotton's bed, and began beating Cotton, bashing Cotton's head multiple times with this makeshift weapon.

To stop the attack, Sergeant Jordan stepped onto the scene and found Tellis still holding the padlock weapon. Other officers arrived to assist Sergeant Jordan. Soon, Captain Finley and Sergeant Jordan restrained Tellis and escorted him out of the dormitory.

At 12:11 a.m., only five minutes after the attack, Nurse Benson arrived to provide medical assistance to Cotton, and within three minutes of arriving, Nurse Benson transported Cotton to the North Infirmary. Around nine minutes later, at 12:20 a.m., Nurse Benson noted that Cotton suffered head injuries—namely, one "gaping" laceration to his left forehead with profuse bleeding, and one "deep[,] gaping wound" behind his left ear. Because of his injuries, at 12:30 a.m., Dr. Fuller ordered Cotton to be transported to the University Health System Emergency Room.

But Pafford EMS did not receive that transfer request until 12:51 a.m., and while waiting on EMS to arrive, Cotton was in severe pain, confused, vomiting, and lethargic. Eventually, at 1:14 a.m., Pafford EMS came and transported Cotton to the hospital, finally arriving at the emergency room at 2:47 a.m. Eight days later, however, Cotton was deemed "clinically brain dead," removed from the ventilator, and pronounced dead at 8:15 p.m.

Cotton's minor son and minor daughter—Kenneth M. Cotton III and Logan Guidry, respectively—sued the Louisiana Department of Public Safety and Corrections ("LPDSC"), Warden Goodwin, Tellis, and the LPDSC's insurers,[1] seeking damages under 42 U.S.C. § 1983 and

---

[1] Default judgment was entered against Tellis; it turned out there were no insurers for plaintiffs to sue.

Louisiana's wrongful-death and survival-action statutes.[2]  Relevant here, Appellants alleged that the LPDSC and Warden Goodwin (among others) failed to protect Cotton, failed to prohibit padlocks in the prison, failed to train employees properly, and failed to render timely and adequate medical care.

After Appellees removed to federal court, they moved for summary judgment on the grounds of qualified immunity, the lack of any constitutional violation, and the corresponding lack of supplemental jurisdiction over the remaining state-law claims.  The district court granted summary judgment, dismissing the federal law claims with prejudice and the state law claims without prejudice.  Cotton's family appealed.

## II. STANDARD OF REVIEW

On appeal, this court reviews a district court's grant of summary judgment de novo. *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 275 (5th Cir. 2014).  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  While "[t]he court is to consider evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party," *Bluebonnet*, 754 F.3d at 276, summary

---

[2] Cotton's mother originally brought this action, but once she learned that Cotton had two minor children, she amended her complaint and substituted the children's mothers—Amy Nobre and Chastity Guidry—as proper plaintiffs. *Nobre ex rel. K.M.C. v. La. Dep't of Pub. Safety*, 935 F.3d 437, 439 (5th Cir. 2019).  This court found that substitution to be proper. *Id.* at 438.

No. 24-30754

judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

A qualified-immunity defense changes the usual summary-judgment burden of proof. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). "Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Id.*

## III. Discussion

Appellants contend that the district court erroneously granted summary judgment because genuine fact issues exist on whether LDPSC and Warden Goodwin (1) failed to protect Cotton from the risk that another inmate would attack him with a padlock, (2) failed to provide adequate medical care to Cotton, and (3) failed to train medical staff or other employees. The court disagrees for three reasons. First, because neither LPDSC nor Warden Goodwin in his official capacity count as a "person" within the meaning of Section 1983, claims against the prison and the Warden in his official capacity fail. Second, Appellants failed to prove supervisory liability against Warden Goodwin. Third, irrespective of supervisory liability, plaintiffs proved no underlying constitutional violation. We discuss each point briefly.[3]

### A.

_____

[3] Beyond the federal-law claims, the district court dismissed Appellants' state-law claims without prejudice on the ground that it had already dismissed all the federal claims. Appellants do not challenge this.

5

As a threshold matter, LDPSC and the Warden contend that summary judgment was properly granted for the prison and Warden Goodwin acting in his official capacity because neither one is a "person" subject to liability under Section 1983. This is correct. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). This court has previously applied *Will* to departments of state government. *See, e.g.*, *Cronen v. Tex. Dep't of Hum. Servs.*, 977 F.2d 934, 936 (5th Cir. 1992) (Texas Department of Human Services is not a person under § 1983); *Washington v. Louisiana*, 425 F.App'x 330, 333 (5th Cir. 2011) (per curiam) ("The State and [the Louisiana Department of Public Safety] are not persons within the meaning of [§§ 1983 and 1985].");  *Lumpkins v. Off. of Cmty. Dev.*, 621 F.App'x 264, 268 (5th Cir. 2015) (per curiam) ("State agencies and state officials acting in their official capacities are not 'persons' within the meaning of the statute."). Although the district court did not appear to address this issue in dismissing Appellants' claims, this court "may affirm summary judgment 'on any ground supported by the record, even if it is different from that relied on by the district court." *Bluebonnet*, 754 F.3d at 276 (quoting *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001)). Dismissal would have been proper on this basis alone.

## B.

The only remaining claims are posited against Warden Goodwin in his individual capacity. But Warden Goodwin was not personally involved in the incident, so the court must determine whether Warden Goodwin is otherwise liable as a supervisor.

Generally, "Section 1983 does not create vicarious or respondeat superior liability." *Evett v. DETNTFF*, 330 F.3d 681, 689 (5th Cir. 2003) (italics omitted) (internal citations omitted); *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001) ("[S]upervisory officials are not liable for the

actions of subordinates on any theory of vicarious liability."). Thus, "[t]he issue of whether a supervisor may be held liable under 42 U.S.C. § 1983 requires a separate analysis." *Evett*, 330 F.3d at 689.

Accordingly, a plaintiff may only prove supervisory liability for a non-personally involved defendant by showing that "there is a 'sufficient causal connection' between the supervisor's conduct and the constitutional violation." *Id.* (quoting *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)). Stated differently, "[a] supervisory official may be held liable . . . only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (alteration in original) (internal citation omitted).

The record here says nothing about Warden Goodwin's personal involvement in the fatal attack on Cotton, the alleged delay in calling for an ambulance, and the alleged failure to train other employees. No record evidence suggests that Warden Goodwin's conduct caused the incident. At most, the record shows that Warden Goodwin talked with other staff about the use of padlocks in the prison, but he believed that padlocks were necessary to create a safer environment that lowered the risk of theft and theft-related violence. That is not enough for supervisory liability, especially because it fails to show that that "the misconduct of the subordinate [was] affirmatively linked to the action or inaction" of Warden Goodwin. *Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539, 550 (5th Cir. 1997). Appellants did not produce evidence creating any material facts necessary to establish Warden Goodwin's participation or policies that caused injury to Guidry.

## C.

Even if threshold issues about supervisory liability existed, Appellants still had to demonstrate an underlying constitutional violation. They allege

failure-to-protect, failure-to-provide-adequate-medical-care, and failure-to-train claims, but they must show that the claims rested on policies implemented by Warden Goodwin.  In addition, their supervisory claims "must show that the supervisor act[ed], or fail[ed] to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates."  *Ford v. Anderson County*, 102 F.4th 292, 321 (5th Cir. 2024) (emphasis omitted) (quoting *Porter*, 659 F.3d at 446).  Evidence is lacking to imply that Warden Goodwin was deliberately indifferent.

**1.**

First, Appellants argue that Warden Goodwin failed to protect Cotton because he was deliberately indifferent to the harms that padlocks presented to prisoners at DWCC.  We disagree.

"Deliberate indifference is an extremely high standard to meet." *Torres v. Livingston*, 972 F.3d 660, 663 (5th Cir. 2020).  "Prison officials are not, [after all], expected to prevent all inmate-on-inmate violence." *Adames v. Perez*, 331 F.3d 508, 512 (5th Cir. 2003).  Instead, a prison official is "deliberately indifferent if he knows of an 'excessive risk to inmate health or safety' and disregards that risk."  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994).  "This knowledge requirement is subjective: The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Hernandez v. Velasquez*, 522 F.3d 556, 561 (5th Cir. 2008) (internal quotations omitted).  A risk is "substantial" when it is "objectively intolerable."  *Farmer*, 511 U.S. at 846, 114 S.Ct. at 1983.  For a failure-to-protect claim, the deliberate indifference element requires the plaintiff to show that the defendants "(1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such

potential for harm existed." *Damond v. City of Rayville*, 127 F.4th 935, 938 (5th Cir. 2025) (per curiam) (quoting *Rogers v. Boatright*, 709 F.3d 403, 407–08 (5th Cir. 2013)).

Both a substantial risk and deliberate indifference to that risk are lacking here. Appellants reference several padlock attacks that took place in the one-year period before Cotton's attack. Those few incidents, however, are not enough to establish an excessive risk. At least two circuits have rejected the argument that issuing padlocks to prisoners subjects them to a substantial risk of serious harm. *See, e.g.*, *Lakin v. Barnhart*, 758 F.3d 66, 67 (1st Cir. 2014) (Souter, J., sitting by designation) (holding that the plaintiffs "failed to raise a triable issue of substantial risk" that "inmates would use padlocks issued to them by the [p]rison to assault fellow inmates"); *Beaton v. Tennis*, 460 F.App'x 111, 114–15 (3d Cir. 2012) (holding that the plaintiff had "not raised a genuine issue of fact that the prison's padlock policy creates a substantial or pervasive risk of harm to its inmates" when previous padlock assaults took place "at a rate of 1 or 2 per year," when padlocks were "legimate[ly] use[d]" "to secure prisoners' belongings," and when "inmates may use even the most harmless objects as weapons").

The First Circuit case, *Lakin v. Barnhart*, is particularly apt. There, the prison experienced roughly one or two padlock attacks annually, peaking at six attacks in one year. 758 F.3d at 72. Justice Souter, who authored the majority opinion in *Farmer*, summarized *Farmer*'s application as follows:

> [N]ot every risk carries an inherent threat at a substantial level, or of severity beyond the norms, and here the only record evidence Lakin and Landry offer to suggest that the risk of padlock assaults was "substantial" is the relatively low frequency with which they occurred at the Prison during the period leading up to the assaults they suffered. This, standing alone, does not create a genuine issue of material fact as to

whether the risk was sufficiently substantial to support an Eighth Amendment claim under *Farmer*.

*Id.* (citing *Farmer*, 511 U.S. at 828, 114 S.Ct. at 1974).

*Lakin* is persuasive. After all, if six padlock attacks in one year constitutes a "relatively low frequency" that cannot establish a sufficiently substantial risk of harm, *see id.*, then four attacks in one year certainly pose no substantial risk under *Farmer*.

Appellants also assert that the warden was deliberately indifferent because he "fail[ed] to address a 1-year spike in padlock attacks," likely failed to "appropriately weigh" the benefit of padlocks against "the risk to offenders," and "failed to offer sufficient evidence to establish . . . that a reasoned and deliberative process resulted in a decision to allow the continued use of padlocks." In essence, his alleged lack of a "reasoned and deliberate response" to the padlock attacks is enough to establish deliberate indifference.

Appellants are mistaken. In general, "prison officials who act reasonably cannot be found liable under the [Eighth Amendment]." *Farmer*, 511 U.S. at 845, 114 S.Ct. at 1983; *see also Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). Thus, the Supreme Court recognized that "deference must be given to the officials in charge of the jail unless there is 'substantial evidence' demonstrating their response" was exaggerated or otherwise unreasonable. *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 330, 132 S.Ct. 1510, 1518, 182 L.Ed.2d 566 (2012) (quoting *Block v. Rutherford*, 468 U.S. 576, 584–85, 104 S.Ct. 3227, 3231–32, 82 L.Ed.2d 438 (1984)).

The record here is replete with evidence of Warden Goodwin's reasonable belief that issuing padlocks represented "a reasonable way" to help inmates secure their belongings and "outweigh[ed] the risk that the padlock will be used as a weapon." And because "[t]heft of property of the offenders is a common occurrence, and incidents of theft often lead to violence between the offenders," he stated in his affidavit that "issuing padlocks is a reasonable means of controlling theft and reducing violent confrontations among offenders." Warden Goodwin explained that allowing inmates to use padlocks to secure their property is common in federal and state penal institutions, including those of Louisiana. He warned in deposition that, if padlocks are taken away, "violence and fights and injuries and other things are going to be significantly higher if you just allow random theft." Appellees' expert added that DWCC complied with the American Correctional Association's ("ACA") accreditation process and that DWCC's policy was "the type of policy generally seen within the enforcement and corrections profession" and was "similar to the requirements" that the ACA outlined.

There is no record evidence to the contrary. The failure-to-protect claim fails.

**2.**

Second, Appellants contend that DWCC and its staff were deliberately indifferent to Cotton's medical needs by delaying a transfer to emergency care. This claim has nothing to do with Warden Goodwin, who had no contact with the events surrounding Cotton's injury or the treatment the inmate received. Because of his non-involvement, this court need not opine about whether the conduct of prison staff could be deemed so constitutionally wanting as to constitute "deliberate indifference to a prisoner's serious medical needs." *Domino v. Tex. Dep't of Crim. Just.*, 239

F.3d 752, 754 (5th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06, 97 S.Ct. 285, 291–92, 50 L.Ed.2d 251 (1976)).  The Appellees marshalled a large amount of impressive evidence to challenge this claim, but Appellants simply failed to sue the individuals who ministered to Cotton and saw that he got to the hospital reasonably promptly.  The district court correctly granted summary judgment on Appellants' inadequate medical-care claim.

**3.**

Appellants' final contention is that genuine fact issues exist as to whether Warden Goodwin failed to train prison staff properly.  According to Appellants, Warden Goodwin's failure to train is evidenced by the facts that DWCC's medical staff waited twenty-two minutes before calling for an ambulance and that Warden Goodwin lacked a "deliberate and reasoned policy" in response to the "1-year spike in padlock attacks."

Assuming arguendo that the failure-to-train issue is not forfeited for inadequate briefing, it still collapses on the merits.  For a failure-to-train claim, Appellants must show that: (1) Warden Goodwin failed to train DWCC staff properly; (2) that failure caused a violation of Cotton's rights; and (3) Warden Goodwin's failure constituted deliberate indifference.  *Jason v. Tanner*, 938 F.3d 191, 196 (5th Cir. 2019).

Appellants fall far short of meeting these criteria.  As detailed above, Appellants failed to adduce any evidence that Warden Goodwin was personally responsible for Cotton's injuries or that his alleged failure to train caused Cotton's injuries.  They offered no evidence about DWCC's policies, staff training, or lack thereof.  Instead, they assert conclusionally that the Appellees' expert "fail[ed] to address" these issues.  Not only does that assertion misplace the burden of proof, but it is incorrect because the expert *did* briefly discuss DWCC's policies and found that DWCC's "handling of this situation [was] well within the generally accepted

guidelines of the law enforcement and corrections profession" and that the "officer responded in a manner [that was] consistent with proper DWCC policy and training." As a result, Appellants have not "affirmatively linked" any prison error to any action or inaction of Warden Goodwin. *Southard*, 114 F.3d at 550.

Nor do Appellants create a fact issue about the deliberate-indifference element of failure-to-train liability. For this requirement, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary.'" *Connick v. Thompson*, 563 U.S. 51, 62, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997)). Indeed, a plaintiff must show that the constitutional violation was "highly predictable" or "*so* predictable that failing to train the prosecutors amounted to *conscious disregard.*" *Id.* at 71, 131 S.Ct. at 1365 (emphasis in original). Therefore, "the inadequacy of training must be obvious and obviously likely to result in a constitutional violation." *Thompson*, 245 F.3d at 459 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 n.10, 109 S.Ct. 1197, 1205 n.10, 103 L.Ed.2d 412 (1989)). After all, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 71, 131 S.Ct. at 1365.

Appellants do not show any pattern of constitutional violations. Nor have they explained how DWCC's training was deficient "in a particular respect," *see id.*, whether related to medical care or allowing prisoners to use padlocks. Accordingly, the district court rightly dismissed the failure-to-train claim.

## IV. Conclusion

The judgment of the district court is AFFIRMED.